## JOHN F. BARTON v. GEORGE WEXLER.

Eastern Section. April 7, 1928.

Petition for Certiorari denied by Supreme Court, October 2, 1928.

John R. Todd, Jr., of Kingsport, for plaintiff in error.

Worley & McAmis, of Kingsport, and C. W. Margraves, of Rogersville, for defendant in error.

THOMPSON, J. The plaintiff below, George Wexler, has recovered a judgment for $300, and court costs, against the defendant below, John F. Barton, who was the sheriff of Hawkins county, for

20

wrongfully shooting and damaging the plaintiff's automobile. The defendant's motion for a new trial having been overruled, he has appealed to this court and has assigned errors.

The defendant has sought to make the question in this court that the greater weight or preponderance of the evidence is contrary to the verdict and judgment, and that the trial court should have directed a verdict in his favor upon his motion therefor made upon the ground that the greater weight or preponderance of the evidence is against the verdict of the jury and shows certain facts, etc. This court, of course, does not weigh the evidence in law cases, and can only look to the record to determine whether there is any material evidence to support the verdict and judgment. Neither can a trial court, upon a motion to direct a verdict, weigh the evidence. If there is any material evidence to support a verdict the trial court must overrule the motion for a directed verdict and submit the case to the jury. It is only when asked to do so in a motion for a new trial that the trial judge must weigh the evidence and set the verdict aside if he is not satisfied with it on the evidence or facts, and we cannot review his action even in this particular unless the record shows that he failed and refused to discharge his duty to weigh the evidence on the losing party's motion for a new trial.

We think however that the motion for a directed verdict, the motion for a new trial and the assignments of error in this court are sufficient to raise the question that there was no material evidence to support the verdict and judgment and that the trial court should have directed a verdict in favor of the defendant.

The defendant, Barton, sheriff of Hawkins county, in March, 1924, received word from one, Cam King, Chief of Police of Kingsport, Tennessee, to be upon the lookout for a large car containing liquor which he thought would pass through Hawkins county. Two or three nights later, and on a dark Sunday night in March, 1924, Barton parked his car on a side road just about thirty feet off the Lee highway, which extends from Rogersville to Kingsport, and at a point slightly west of the town of Surgoinsville. With him were his two sons, Joe and Charles Barton, and deputy sheriff, Mayo. They were on the lookout for the liquor car or any other law violators who might pass alone the Lee highway. Barton had previously talked to Esquire Miller, a Justice of the Peace who lived near Surgoinsville, and had arranged with him to bring any law violator whom he might arrest to Miller's home for trial. He had also stationed deputy sheriff, Craddic, and George Vaughn at Surgoinsville and had told them that if any law violator passed him going in the direction of Surgoinsville he would fire a shot as a signal for them to stop him, etc.

About 9:00 p. m., the plaintiff's Dodge car, which was going east along the Lee highway and toward Surgoinsville, at a speed of about twenty-five or thirty miles per hour, passed the place where Barton and his companions were stationed. Barton did not call to the driver of plaintiff's car to stop it, but fired a signal shot to Craddic and Vaughn to stop it. Barton then started up his own car and he and his companions gave chase to the plaintiff's car.

According to the defendant's evidence, Craddic and Vaughn put some chicken coops in the highway at Surgoinsville and called to the plaintiff's driver to stop, but the plaintiff's driver ran around the coops and continued along the highway (with Barton's car in pursuit) in the direction of Church Hill which was some ten or eleven miles east of Surgoinsville. That the driver of plaintiff's car increased its speed as they left Surgoinsville and when the sheriff's car would attempt to pass it, he would pull to the side of the road, and by "horning" the sheriff's car off the road, and nearly causing it to wreck, prevent its passage. That finally, and after they had left Surgoinsville, Barton and his companions began shooting at the tires and gasoline tank of plaintiff's car, which however still kept going. That at a wide place in the road about a mile or two west of Church Hill, Barton managed to pass plaintiff's car and ran on into Church Hill ahead of it. That there he turned his car across the road, and also placed some chicken coops (which had been left in front of a store) across the road. That as plaintiff's car drove up he called to its driver to stop, which he did but not until after he had run into the coops. That Barton then arrested the plaintiff, his driver and his companion. Barton and his companions also testified that as they pursued plaintiff's car Barton frequently called out in a loud voice to stop, that he was the sheriff and that he was attempting to arrest the driver of plaintiff's car, etc., but that plaintiff's driver paid no attention except to increase his speed; and that he was making from forty to fifty miles per hour.

But the plaintiff's testimony, which we must on this appeal accept as true, was as follows:

On Saturday (the day before the day of the trouble) he, B. C. Pendleton and Charles Leeper drove from Kingsport, which was their home, to Knoxville in his (plaintiff's) car. That they spent the night (Saturday night) in Knoxville. That they left Knoxville Sunday afternoon in plaintiff's car and drove to Rogersville, where they went into a restaurant and got something to eat. That when they left Rogersville to go on to their homes in Kingsport, it was night-time and Pendleton, who was the best driver of the three, began to drive. That they did not hear the signal shot which Barton claimed to have fired west of Surgoinsville, but as they passed through

Surgoinsville (at a speed of twenty-five or thirty miles per hour) they heard someone on the side of the road call out "hey." That they thought nothing of this as people had frequently called out to them along the road. That they did not see any chicken coops or other obstructions in the road or any signal to stop. That they drove on through Surgoinsville without realizing that anything was wrong or that they had been called upon to stop. That just after they got out of Surgoinsville they began to hear shots and discovered that some one in a car behind them was shooting at and hitting their car. That they thought it was a "bunch of drunks or hoodlums" and became frightened and not knowing what else to do, they increased their speed—plaintiff and Leeper "scrooching" down into the rear seat so as to be protected by the metal sheet or covering at the rear of the car. That the car behind continued to follow them and its occupants continued firing. That first one rear casing was shot down and then the other. That this caused their car to go somewhat from one side of the road to the other but they did not do anything to prevent the rear car from passing them. That one of the bullets passed through the extra casing on the rear end of plaintiff's car and struck the metal sheet or strip at plaintiff's and Leeper's back. That another bullet made a hole in the gasoline tank and still others struck the body of the car and passed through the fenders. That they kept going although their speed was decreased after the two rear casings had been shot down. That altogether seventeen bullets struck the car, and there were from fifty to seventy-five fired.

That at a point two or three miles west of Church Hill the car behind passed them, and when they got to Church Hill they stopped at Barton's command and discovered that he was the sheriff and that it was him and his companions who had been following and shooting into their car. That as soon as they stopped Barton walked up to the side of their car and without provocation struck Pendleton over the head with his pistol and injured him rather severely. That he then struck at Leeper with his pistol but hit him only a glancing blow as he dodged. That he then handcuffed all of them and called them sons of bitches, etc. That he accused them of being drunk and searched them, the car and their baggage but could find no liquor as they had none and had not been drinking. That he then threatened to "throw them in jail" in Rogersville and not let them make bond. That he would not let them talk to any one. That although Esquire G. P. Cooper was present and was a Justice of the Peace and had an office and home within a few feet of where they were, he (Barton) put them into a car and drove them ten miles or more back the road to Esq. Miller's home for trial. That he re-

fused to let Pendleton who was bleeding from both ears get medical attention and would not let them call any one. But that in spite of Barton's efforts they managed to have some one call Cam King, Chief of Police of Kingsport, and got him to go to Esq. Miller's home. That after King reached there they were permitted to give their checks indorsed by King in lieu of bonds, and were released.

That they finally got their car to running and drove to Kingsport (reaching there about 1:00 a. m.) where Pendleton received treatment from a physician, Dr. O. S. Hauk.

Plaintiff, Pendleton and Leeper all testified positively that with the exception that they heard some one call out the word "hey" as they passed through Surgoinsville, they never heard any one call out to them; that they never heard the defendant or any one else call out to them to stop, or that he was the sheriff, etc. They all testified that they thought it was a "bunch of drunks" chasing them and shooting at them, and that the first intimation they had that it was an officer or officers was when they stopped at Barton's command at Church Hill. They testified that the driver of the car which was chasing them did not seem to be trying to pass them, but would pull up close and fire and would then drop behind again. They denied that they pulled their car from side to side of the road to prevent the other car from passing, etc.

We think it is impossible to reconcile the testimony in behalf of the plaintiff with the testimony in behalf of the defendant. And we are of the opinion that either the defendant failed to give the plaintiff proper notice, to stop and submit to arrest, and therefore needlessly damaged plaintiff's car by shooting into it, or the plaintiff and his companions heard the command to stop but deliberately attempted to drive away and escape and avoid arrest. And since this was a question for the jury we do not think the trial court erred in refusing to direct a verdict. And the jury's verdict supported as it is by material evidence in favor of the plaintiff, is binding on us.

The defendant also insists that it was error for the trial court to permit the plaintiff to prove, over the defendant's objection, that defendant struck Pendleton over the head with his pistol, as this occurred after the shooting which did the damage complained of. Since this evidence tended to reflect upon the question of the good or bad faith of the defendant, and was no doubt so limited by the court, we do not think its introduction constituted reversible error. Moreover, defendant has failed to comply with the rules of this court in that he has failed to cite in his assignment any page number or numbers where this evidence complained of might be found. His assignment mentions the testimony of Wexler, the plaintiff, and by turning to Wexler's testimony (pages thirty-five and thirty-six) we

24

find where he testified about the defendant striking Pendleton, etc., without any objection having been made by the defendant.

The defendant also insists that the verdict of $300 was excessive. But some of the most reliable proof in the record shows that the damage to the plaintiff's car was between $400 and $500. So, this assignment is not well taken.

The remaining assignments are based upon alleged errors in the court's charge to the jury and in his refusal to charge several special written requests submitted by the defendant.

What we presume was the entire charge and also the special requests seem to have been copied into the transcript. It also seems that the charge had been signed by the trial judge, and that the special requests had been marked "denied," and had been signed by the trial judge. But neither the charge nor the requests were in the bill of exceptions, and we therefore cannot review any alleged errors therein. See cases cited in footnotes forty-six and forty-seven under Shannon's Code, section 4693, and footnote twelve under section 7186.

It results that in our opinion there was no reversible error in the proceedings in the lower court, and its judgment will be affirmed, with costs.

All concur.